THE ST. LOUIS BRIDGE CO. ET AL.

v.

SARAH E. FELLOWS, ADMINISTRATRIX.

*Railroads—Bridge Company—Personal Injuries—Defective Track—Evidence—Special Findings.*

In an action to recover from a bridge company damages for the death of one of its employes, wherein the jury specially found that the accident occurred through the negligent construction of its tracks, this court holds that the special findings were not warranted by the evidence, and that the verdict for the plaintiff based thereon, should not be allowed to stand.

[Opinion filed June 9, 1891.]

APPEAL from the City Court of East St. Louis, Illinois; the Hon. B. H. CANBY, Judge, presiding.

Messrs. G. & G. A. KOERNER, for appellants.
Inasmuch as the mere happening of an accident is not *prima*

*facie* evidence of neglect of employer (Smith v. M. & L. R. R. Co., 18 Fed. Rep. 304) we contend that under the evidence the court should have given the following instruction as asked by appellants:

" The court instructs the jury that the plaintiff has failed to sustain by evidence the material facts charged in the declaration and that the verdict must be for defendant."

Where the whole evidence is so insufficient that it can not sustain a verdict, it is the duty of the court, as a matter of law, to find for the defendant. Simmons v. C. & Tomah R. R. Co., 110 Ill. 346; L. S. & M. S. Ry. Co. v. O'Conner, 115 Ill. 261; Bartellot v. International Bank, 119 Ill. 271.

An employe can not recover for an injury resulting from one of the usual risks or hazards connected with the business into which he has entered, and which the law will consider that he has assumed when undertaking the duties of the position. I. B. & W. R. R. Co. v. Flannigen, 77 Ill. 365; L. R. & F. S. v. Duffey, 4 Am. and Eng. R. R. Cases, 637.

A master's liability for injuries to his employe from defective arrangements is not that of an insurer or guarantor, if the defect was apparent to ordinary observation. It is a question of reasonable care and diligence. Batterson v. C. & G. T. Ry. Co., 49 Mich. 184; 8 American and English R. R. Cases, 123.

Under the evidence there can be no doubt that the appellant used not only reasonable care and diligence in providing against a defect capable of causing an accident, but used extraordinary care to provide the best possible appliances.

A master is liable for injuries to a servant only when he knows of the defect causing the accident, or when by the exercise of reasonable care and diligence, he ought to have known. T. P. & W. R. R. Co. v. Conroy, 61 Ill. 162; T. W. & W. R. R. Co. v. Ingraham, 77 Ill. 309; C. & H. R. R. Co. v. Platt, 89 Ill. 141.

The fact that that part of the track where the accident occurred had been in use for a long time prior to the accident, and that no other mishap had ever occurred at the same place, that it was used immediately after the accident, that it had

frequently been inspected and declared all right, and that no one is able to account for the accident, makes it necessary to consider the accident that caused the death of Fellows one of the risks or hazards incident to his employment.

The jury, by their special verdict, find that the death of Fellows was caused by the negligence of the track inspector, and as a switchman and track inspector are co-employes, the refusal of the following instruction was error:

"Even if it should appear from the evidence that the track was out of repair, owing to the negligence of the track foreman or road master, or any person charged with an examination of the track, employed by the company, the defendant can not recover, the switchman and the track inspector employed in the same yard being co-employes."

All who engage in accomplishing the ultimate purpose in view, that is, running of the road, must be regarded as engaged in the same general business, within the meaning of the rule. Hurd v. V. & C. R. R. Co., 32 Vt. 473.

Those who are engaged in the service of the same master in carrying on and conducting the same general business in which the usual instrumentalities are used, may justly be called fellow-servants.

A proper test of this relation is whether the negligence of the one is likely to inflict injury on the other. Valtez v. O. & M. R. R. Co., 85 Ill. 500.

Messrs. W. P. LAUNTZ and JESSE M. FREELS, for appellee.

Sweeney, their track foreman, on cross-examination, says " he constructed this track " about two years before, and that he "did not give the outside rail any elevation," and that no double or second rail was placed there to take the place of elevation on this curve. This track was dangerously defective in its construction, and the defendants had notice of these defects in their track, which were defects in construction, two years before the time of the injury, and were guilty of gross negligence in failing to remove them and make the track safe; and appellant, having thus negligently failed to take any steps to make its track safe, is liable for this injury

caused by its negligence. C., B. & Q. R. R. Co. v. Gregory, 58 Ill. 273; Whalen v. I. & St. L. R. R. & Coal Co., 16 Ill. App. 324; C. & I. R. R. Co. v. Russell, 91 Ill. 298; Ill. Cent. R. R. Co. v. Welch, 52 Ill. 183; C. & A. R. R. Co. v. Johnson, 116 Ill. 206; T. P. & W. Ry. Co. v. Conroy, 68 Ill. 561; North. Pacific R. R. Co. v. Herbert, 116 U. S. 647; Chicago & N. W. Ry. Co. v. Swett, 45 Ill. 201.

In the Swett case, *supra*, our Supreme Court say: " It is well settled the employer corporation is bound to furnish to their servants safe materials and structures. Such an obligation is permanent, and can not be avoided by the delegation of the power or authority to any other, or number of persons; for the undertaking with their servants is direct, that they will furnish suitable and safe materials and structures, and properly skilled and careful persons to assist in running the trains, * * * and most especially that they shall, in the first instance, properly construct their road with all its necessary appurtenances."

The duty of building this track on this fourteen degree curve with an elevation on the outside rail, and with a second rail on the inside of the inside rail on said curve, in order to make it a safe track for the purposes for which it was used, was a duty imposed by law, as alleged in the declaration, upon the defendants, and the failure on their part to thus construct said track was an " omission and a failure of duty in construction, for which they are liable to the plaintiff." Chicago & C. I. R. R. Co. v. Hines, 23 N. E. Rep. 1022.

But in addition to this notice of these patent defects in construction, which the defendants were in law bound to know and take notice of, they had actual notice of the dangerous condition of their track at this curve, by having had other engines and cars run off there before this injury.

And appellant was also guilty of negligence in failing to exercise ordinary care in the selection of the servants in charge of its tracks. An examination of the evidence of Sweeney, the track foreman, and of Comer, his assistant, will show that they were wholly incompetent for the responsible positions they held, and that appellant knew this, or by the

exercise of ordinary care might have known it, long before the injury.

The learned counsel for appellant assign for error the giving by the court of the instruction asked by appellee, but have failed to urge or discuss this assignment in their argument, and, as they have abandoned this assignment, we will not trouble the court with an extended consideration of it, but will content ourselves by saying that said instruction was properly given; that it presented the case fairly and fully, under the law and the evidence, to the jury, and that it is sustained by the law as expressed in Whalen v. I. & St. L. R. R. & Coal Co., 16 Ill. App. 323; Ill. Cent. R. R. Co. v. Welch, 52 Ill. 186; C. & I. R. R. Co. v. Russell, 91 Ill. 303; T. P. & W. Ry. Co. v. Conroy, 68 Ill. 561; U. S. Rolling Stock Co. v. Wilder, 116 Ill. 109, and other cases.

Green, J. The case was before us on appeal at the August term, A. D. 1889, and is reported in 31 Ill. App. 282. The jury (as shown by that record) then, in answer to the question, " What officer, agent or employe, or servant of one of the defendants, was guilty of negligence, resulting in the death of Fellows?" said, by their special finding, " The officer in charge of said *track repairing;*" and, in answer to the question, " In what did the negligence of such officer, agent or employe consist?" said, by their special finding, " In *failing to keep said track in proper condition.*" We reversed the judgment and said in the opinion: " We find no evidence establishing the charge that the track and road bed at place of accident was not properly constructed;" and further said, " We discover no evidence in this record justifying the verdict." In the present record it appears the jury specially found that the negligence of the defendants, resulting in the death of Fellows, was in *not properly constructing the tracks in question, in the ordinary and usual manner, according to the methods usually adopted for such construction.* Upon these special findings the general verdict is based, and can only be sustained on the ground that the evidence justified such special findings. The appellee, at the trial, introduced as ex-

perts upon the question of construction, Weber, Locke and Bisdom. Weber, a surveyor and civil engineer, after he had testified what elevations of the outside road, at a curve, should be given, according to the rules for building tracks at curves laid down in the books for engineers, further testified that the elevation of the track in the switching yards would be impossible; that what he had said about elevations at curves applied to the *main track* on the road; that the reason it would be impossible to construct in that way in the yards, was, that the different elevations would interfere with the crossings of switches. This witness, in reply to the cross-interrogatory, "Consequently, when you look upon these as a construction of switch tracks in yards, they are properly constructed, are they not?" testified: "I think so." Locke, who was in real estate business, and a civil engineer by profession, testified the rule was, in a track having a curve of thirteen or fourteen degrees, to elevate the outside rail a good deal higher than the inside rail; did not remember just what it should be; that it had been a good while since he had had anything to do with that. And in answer to the question, "Is a track with a fourteen degree curve properly constructed flat?" said, "No, sir, I think not." On cross-examination he testified he did not know anything about the yards of defendants, and had never been in them. That he was not very much familiar with the construction of said road tracks in switch yards. That he had constructed yards a good while ago. That the rule he referred to in regard to tracks, is where the train is supposed to have an unimpeded run; there an elevation is proper. That he thought it would be practicable to have a slight elevation; not so great an elevation in yards of this character. That he had never examined the yards in question at all, and had not paid any attention to the switch yards of any other railroads. Bisdom, a civil engineer in the railroad business, testified: "There is a rule in engineering that the outside rail should be higher than the inside rail, on a curve, according to the speed of the train going over it. On a curve of thirteen or fourteen degrees, when a train is going ten or fifteen miles an hour, the elevation should be an inch to an inch and a quarter."

In answer to the question, "Then a track with a thirteen or fourteen degree curve—is that properly constructed level?" witness said, "you must understand me. I am talking now about a straight track." He was then asked "and when you come to a curve?" and replied, "and there you come to a curve in the track." He was next asked, "You say, then, that a track with a thirteen or fourteen degree curve would not be properly constructed unless the outside rail was raised in accordance with what you have stated?" and answered, "Yes, sir." The cross-examination of this witness confirms the inference we draw from his testimony in chief, that the elevation of the outside rail is proper at a curve on the main track but not in yards like those in question here. Taking all this expert testimony together and giving it a construction as favorable to plaintiff's theory as we think it entitled to, and it fails to justify the finding of the jury that the track and switch in question were not properly constructed.

Supplementary to this expert testimony, and for the purpose of proving that the track in question was improperly constructed, plaintiff introduced and examined several witnesses. May testified: "Had done track work and switching; was not a track builder, worked at it. As a general rule the outside rail is elevated on a fourteen degree curve. So far as the degree of curve is concerned, I don't know anything about degrees. It has been some time since I worked at it. As a rule the outside rail is elevated on a curve. It is considered safe to have it elevated." To the question "Is it considered unsafe when it is not elevated?" he replied, "Well, yes, I know it cuts the rail when it is not elevated. It is liable to climb the rail; the car run off the track." To the question, "Is it considered unsafe, Mr. May, to so construct a track that the engine will run off?" he replied, "They usually build them so that they won't run off; that is what they are built for." On cross-examination this witness testified he was not acquainted with the bridge yards; did not know when the accident happened; and in answer to the question, "Do you know whether those tracks, leads and switches are properly constructed for the purposes for which

they are used or not?" testified, "No, sir; I don't know any-
thing about it." Warren, a switchman, testified a track with
a fourteen degree curve is not properly constructed flat. To
have it safe according to the rule it should have an elevation
in the outside rail; that is to prevent the engine from leaving
the track. When the outside rail is not on an elevation the
simple thing is the engine goes off the track. It might go
over a dozen times and the thirteenth time it would go off
and kill everybody. On cross-examination, after he had tes-
tified that it would be practicable to build the track on a curve
in the yards with the outside rail elevated, he testified, "You
can not split the switches, but after it leaves the main track it
can be elevated, after it leaves the frog;" and was then asked,
"But just at the place it leaves the frog can there be an
elevation?" answered, "There can, yes sir, by raising the rail
with the plates;" and was then asked, "Is that the usual
and practicable construction?" replied, "Well, I could not say
that that is the usual and proper construction. I am not well
enough posted in track work to say that;" and on re-examina-
tion testified he knew what was necessary to make a safe
track. That unless they elevate the rail an engine going
around is very likely to get off the track; that unless a track
is elevated and has a guard-rail it is not safe. Hakes, the
same witness whose testimony we commented on in the former
opinion, testified again, and it is unnecessary to add anything
to what we there said; it is applicable to his testimony in this
record. Reynolds, switchman, testified he knew where these
tracks and grounds were, and was asked, "I will ask you
whether this track with a thirteen degree curve is properly
constructed flat then?" he answered, "Well, yes sir;" and
was next asked, "You say it is properly constructed flat?" and
answered, "Well, I don't know anything about that;" and was
next asked, "You did not understand my question. I asked
you if a track with a fourteen degree curve is properly con-
structed flat; if the outside rail is not elevated?" and then
answered, "Well, if it is not elevated why of course it is not
constructed properly;" and then testified he did not think it
would be safe unless it was elevated. On cross-examination,

being asked (after stating he knew where accident happened) if he considered the track there properly constructed, answered: "Well, I am track man myself;" then said he had worked there over those tracks, and the same question was then again asked him and he replied, " Well, I will tell you; at the time this happened I was working for the Bridge & Tunnel Co. up until 1886. I quit there in 1886 and was not working at the Bridge & Tunnel until 1888."

He then testified " these tracks were then there. So far as their condition was concerned we had no trouble, only in 1884 a car got off the track. Since I was there this switch has been used all the time, day and night. As far as the elevation of the track is concerned, I am no track man, don't know what it ought to be; it ought to have a little elevation;" and was asked, " Where there are so many switches and frogs, is it proper construction to have the outside rail elevated? is it not dangerous?" replied, " I don't know anything about that." Bucklew, train dispatcher, said to a certain extent he was familiar with the construction of railroads; not about East St. Louis; should judge a track with a thirteen degree curve is not properly constructed flat; should say a curve should have a guard-rail, or be elevated more or less; the elevation would depend on whether the curve is short or long. The outside rail is elevated to keep the engine from running off in turning the curve." On cross-examination admitted he had no personal knowledge of building railroads and was not prepared to answer the question as to whether the track at the place of the accident was properly constructed or not; never examined that place and did not know whether the track was properly constructed or not. Sweeney, track foreman for defendant, testified that deceased was employed as switchman for defendant for five or six months preceding his death; that, in the opinion of witness, no elevation of outside rail was needed on a switch like the one in question. Can determine by looking at track that it is in good condition; looked at track after the accident; it was all right. " I saw the track was all right. Outside rail did not need any elevation; was there probably twenty minutes or half an hour after

accident; engine then off the track; in constructing tracks we use a gauge.   We tested track with gauge where engine went off ; found the track was all right.   Had not put in any rail there the day before; did not change the guard-rail there the day before or the same morning;  John Conner is my assistant; he is a track walker.   If he sees defects in track his duty is to report to me; to tighten bolts and see that things in general are all right.   When I give him orders he puts down rails and changes guard-rails.   When the engine was put back on track they tried to move the engine over the same track and it struck the guard-rail; did not turn off; did not remount the rail; don't know why it did not go ahead with it.   The damage done to track was repaired; just leveled up the place again.   The guard-rail was there until the track was moved, three to six months ago.   The same guard rail is there yet in that track.   Could not say why they backed the engine off, and through some other track.   Was around there until engine was put on track, backed out of the switch and run down on another track.   I believe I saw that place day before the accident; would not say positively."   On cross-examination, this witness testified: " These tracks are in the defendants' yards.   It is a good yard; there are no better switches and no better yards in the United States, and none better taken care of; saw the place where the engine got off the day before, or day before that.   It was in good condition; and after the accident it was in the same condition, and the same switch was used. The same switch and rails are used there yet.   I can show the same guard-rail down there yet.   Have had twenty-two years' experience in the laying of railroad tracks; seven years with defendant company.   At the point where accident occurred I could perceive nothing that would cause it.   The switch is built on the same principle as all other switches. Robert P. Taussig was the engineer in charge of the construction of the tracks.   Watts, switchman in employ of defendant, saw place of accident about twenty minutes after it happened; engine was off the track; was not there more than

ten or fifteen minutes; made no examination of the track; suppose there is a cause for an engine running off the track; frequently you can not see the cause." On cross-examination he testified: "We are switching over the same place where accident occurred every day." The testimony of Bennett, the same witness who testified at the former trial, was the same as theirs, and what we said in former opinion about it applies now. John Conner, a track walker in defendant's employ, described his duties. Was at place of accident about an hour after it happened. It was all right as far as he could see and judge; engine was off the track; nothing was done to the rails so far as he could see; there was a guard-rail there; "I did not put it down; could not tell who put it down; could not tell when it was put down, but guess it was put down when the track was laid." On cross-examination witness testified he had been employed as track walker in these yards for two years before the accident. Saw this switch and guard-rail at the place deceased was hurt once a day, and sometimes twice. It was in general use all this time. Sheers, assistant yard master of defendant, testified he rode over the track at place of accident every day in 1886. Could not say anything about elevation of rails at curves; the outer rail is provided with guard-rail. On cross-examination testified he had been acquainted with these yards where this accident occurred for eight or nine years; passed along there every day on an engine. This switch was in use all the time since it was built. It was in good order. It was used afterward on the day of accident; kept right on working. On re-examination said he did not inspect that track; passed over that switch three or four times before the accident that morning. Kensall, switchman in employ of defendant, was at place of accident not long after it occurred. Was sent to help put engine on track; did not see engine jump off ; helped put it on; best recollection is that engine started to run off again and then dropped down. On cross-examination testified he had passed over that switch often; as far as he could see it was all right; did not examine it closely; it was like any other switch; had not noticed it that morning; did

St. Louis Bridge Co. v. Fellows.

not know whether it was all right when that engine ran over it. Dunlap, agent for defendant, was at place of accident; got there and engine was moved about forty feet back, and when they moved it forward it started to mount the guard-rail. This was near the place it had run off. The engine was injured in running off the track and from the contact with other cars.

On cross-examination testified the general condition of that yard is better and the tracks in as good condition as any yard he ever saw. That same switch was in constant use ever since and on same day of accident. Hardway, engineer running the engine at time of accident, testified that the engine was going from one track to another at from six to about eight miles an hour, and when the engine got to the guard-rail it jumped the track and went cross-ways into cars standing there, about from eight to fifteen feet. It happened very suddenly. Where the accident occurred there is not a very sharp curve, but a slight curve. After engine got back on track started forward again and it started to mount the guard-rails at same place. Then we backed out and went up another track. I went by signals and presume we did not go up the same track, because the engine would not go over there. We then ran the engine to the shop, across the bridge. If that track had been all right I suppose the engine would have run over it. Could not say, that was my first trip over that track that day. That was the first day I had worked in that yard for a good while; had been working nights. On cross-examination, testified he could not account for the accident; did not know whether track was in order or not; supposed if track was in order engine would have gone over all right; passed over same place while working there nights; nothing had ever happened there before. An engine is liable to jump the track and they claim they can not tell whether there is anything the matter with the track or not. Lots of times they jump the track and the cause is not known, but it seems there ought to be some cause or they would not jump. Had worked in that yard since that time; worked down there several times. Berg, the fireman on

same engine, testified he was on front end of engine when, accident occurred. "After the accident the engine was pulled back on the track; did not notice whether engine mounted the guard-rail after they started it forward; suppose they backed her out. We were going about five or six miles an hour. There must be a cause for engine leaving the track, but what cause I do not know. Have run on that track lots of times since that accident. If the track is in good order and the engine is all right, and an engine jumps the track running at that speed, there must be something to cause it, whatever it is I do not know. To the best of my knowledge the track there is a flat track." Wilson's deposition, the same as on former trial, was read, and we desire to add nothing to what was said concerning his testimony in the former opinion. Baily's testimony related only to the duties of switchmen. The evidence of Sweeney on former trial upon cross-examination by plaintiff was next read. He testified he built switch in question; did not give outside rail any elevation; did not have a rail on the inside of outside rail; track was built there about two years before the accident. Don't know where engine got off the track. Was there shortly after accident occurred; saw engine off the track. Can't tell when repairs were made there before accident. Know no repairs were made there the day before. "Conner did not make repairs or put down rails except by my instructions. If he made any repairs at this place I don't know anything about it." The foregoing witnesses were all that testified in behalf of plaintiff, and while we have not reproduced all their testimony, we have stated all that seemed material upon the question of the construction of the track and switch at place where the engine was derailed. And this evidence, including the testimony of these experts examined on behalf of plaintiff, falls far short of proving the facts found by the jury, viz.: That the negligence of defendants resulting in the death of Fellows *consisted in not properly constructing the tracks in question in the ordinary and usual manner, according to the methods usually adopted for such construction.* But in addition to this, the testimony of three experts testify-

St. Louis Bridge Co. v. Fellows.

ing on behalf of defendants, further negative that special finding. Taussig, the civil engineer who laid out and constructed the track and switch in question, Sharman, a civil engineer engaged in civil engineering on railroads, Eayre, a civil engineer of large experience in this kind of work, all concur in the opinion, and so testify, that these tracks were constructed in a safe and proper manner, and in accordance with the most approved methods. Moreover it appears in evidence that for a long time before this accident and ever since, engines and trains have been continuously operated over this track and switch day and night; that no change of construction has been made, and no complaint or remonstrance appears to have been made by the employes engaged in running and operating such trains. It seems incredible that they would incur the extra hazard which would be imposed upon them if this structure was unsafe or defective for so long a time without objection, or that defendant corporations would permit such track and switch to be so used, if dangerous or improperly constructed. In view of all the facts and circumstances proven, we are compelled to hold that the special findings were not warranted by the evidence, and the general verdict based thereon should have been set aside and a new trial awarded. The other questions to which our attention has been invited by counsel for appellant, we deem it unnecessary to discuss, inasmuch as we find the evidence insufficient to justify the special finding and verdict of the jury. The judgment is reversed and cause remanded.

*Reversed and remanded.*